IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHAWN PARKER, | ) |
| | ) No.: |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JUSTIN PARKER, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

NOW COMES Plaintiff, Shawn Parker ("Shawn"), by and through her attorneys, Roetzel & Andress, LPA, and for her Complaint against Defendant, Justin Parker ("Justin" or "Defendant"), and states as follows:

## NATURE OF THE ACTION

1.     This case arises from the Defendant's breach of his payment obligations in purchasing the business assets and goodwill of Shawn's financial services business.

2.     On June 8, 2020, Shawn sold her lucrative financial services business (the "Business") to her adult son, Justin, for $16 million. Justin's payment for the Business was financed through a $16 million Promissory Note ("Note") that Justin executed in his mother's favor at a heavily-discounted interest rate.

3.     Justin defaulted on the very first Note payment and failed to cure his default within 10 days after receiving Notice of that default. To date, Justin has refused to pay any money for the Business despite the value of the Business skyrocketing in the year-and-a-half since the sale.

4.     Pursuant to the terms of the Note, the entire debt accelerated and is currently due and owing, including interest.

5.     Justin's refusal to pay a single penny for his mother's Business necessitated this lawsuit for damages and, alternatively, other relief. In Count I, Shawn brings a claim for beach of contract due to Justin's failure to pay under the Note.

6.     Count II seeks a declaration that due to Justin's default under the Note, the entire debt was accelerated and the attrition clause in one of the parties' agreements, which could adjust the sales price of the Business two years after purchase (i.e., in June of 2022), is now moot and unenforceable.

7.      As an alternative form of relief, and solely in the alternative to the claim for Breach of Contract, Shawn seeks in Count III a declaration that: (i) because of Justin's failure to pay any of the purchase price of the Business, Shawn is no longer bound by any of the restrictive covenants of the Non-Competition Agreement that was executed as part of the sale of the Business; and (ii) as a result, Shawn is free to compete with Justin and is permitted to individually solicit any of her former clients and attempt to transfer the client accounts to a different broker.

8.     Shawn also asserts in Count IV a claim, in the alternative, for unjust enrichment against Justin, seeking disgorgement of all compensation earned to date from the Business which, on information and belief, exceeds $9 million.

**THE PARTIES**

9.     Shawn is Justin's mother and an individual who is a resident and citizen of the State of Florida.  Shawn had a successful 30-year career as a financial advisor running her own financial advisory business with over $500 million in assets under management.

10.     Justin is Shawn's son and an individual who is a resident and citizen of the State of Illinois.  With his mother's support, he gained knowledge of the Business and requested that he be allowed to purchase the Business upon her retirement.

**JURISDICTION AND VENUE**

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), as complete diversity exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. Shawn is a citizen of Florida and Justin is a citizen of Illinois.

12.     This Court has personal jurisdiction over Justin because he is a resident of the State of Illinois. Exercising personal jurisdiction over Justin fully complies with all due process requirements.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Justin is a resident of Illinois and a substantial part of the events or omissions giving rise to the claim occurred in this District.

**FACTUAL ALLEGATIONS**

**A.      Shawn Develops a Highly Successful Investment Advisory Business.**

14.     Shawn, a single mother, dedicated her entire professional career to developing a successful financial services advisory business.

15.     Over her 30+ years of practice, Shawn operated a Business through which she ultimately supervised over $500 million of assets under management and a staff of 11 employees. She has been widely honored for her work.

16.     Shawn carved out her successful career in a competitive profession through dedication, hard-work, and developing close personal relationships with her many clients.

17.     In approximately 2002, after Justin dropped out of college, Shawn hired her son for a supporting role with her Business.

3

18. Justin's role with the Business was mainly non-client facing throughout the time he worked for his mother.

**B.     Shawn Operated Her Business as a Branded Financial Advisor With Ameriprise.**

19. Beginning in 1999 and continuing until her sale of the Business, Shawn ran her financial advisory practice as an independent franchisee of Ameriprise Financial, Inc. ("Ameriprise"), operating under the Ameriprise brand.

20. Ameriprise is a financial services company that sells a variety of financial products and services, including wealth management, asset management, insurance, annuities, and estate planning to individuals, businesses and institutions.

21. Shawn was an independent Ameriprise franchisee prior to selling her Business to Justin. Currently, Justin is an independent Ameriprise franchisee.

22. The accounts for Shawn's clients were custodied with Ameriprise, meaning that the actual funds were maintained by Ameriprise and any purchases, transfers or account adjustments were made through Ameriprise.

23. Shawn was designated as the responsible "broker" for the relevant accounts and was authorized to make any purchases, transfers or account adjustments for her clients directly on the Ameriprise platform.

24. As compensation, Ameriprise paid Shawn commissions and other income based upon her sales of financial services and products. Shawn used this income to pay office rent, employees' salaries and her compensation. This income stream was part of the "good will" that Justin purchased for $16 million.

4

**C.     Shawn Decides to Retire and Sell the Business.**

25.     In approximately 2015, Shawn started contemplating retiring within the next five years.

26.     When she informed her son of the decision, Justin indicated that he expected his mother to gift him the Business.  Shawn declined to gift him her Business, but was willing to sell him the Business at a discounted price.

27.     Over the next several years, Shawn and Justin took steps to prepare Justin to take over the Business.  Shawn reasonably concluded that the Business was worth $20 million payable immediately if sold to a different third-party Ameriprise broker.

28.     In order to persuade Shawn to sell him the Business at the discounted rate and not cash out to a third party, Justin indicated that he would be the best person to provide service to Shawn's clients, given his pre-existing relationship to the Business.

29.     While she could have sold the Business for substantially more money to an unrelated third-party, Shawn wanted to provide the best service to her clients, and was persuaded that Justin would pay her for the Business, and by late 2019 had agreed to sell the Business in its entirety to Justin.

30.     Once the Parties reached an agreement that Justin would purchase the Business, Justin retained counsel to draft the contractual agreements.  Shawn was not represented by counsel in the sale.

**D.     The FINRA Investigation of Shawn.**

31.     Upon information and belief, in late 2019, around the time that Shawn agreed to sell the Business to Justin, the Financial Industry Regulatory Authority ("FINRA") commenced an investigation into Shawn's Business.

32.     This was the first FINRA investigation in Shawn's 30+ year career as a financial advisor.  The FINRA investigation did not relate to the handling or management of client assets, but instead stemmed from a non-client related compliance issue.

33.     Shawn contests the basis of that investigation, but given her preexisting intent to retire, Shawn agreed to terminate her relationship with Ameriprise on or about February 15, 2020 with an agreement to stay the effect of that termination until the Business was sold to her son Justin – also an Ameriprise broker.

34.     At the time Justin commenced having his attorneys draft the contractual agreements, he was aware of the pending FINRA investigation regarding Shawn and that Shawn had agreed to terminate her relationship with Ameriprise as of the date the sale was finalized.

**E.     The Contractual Agreements.**

**I.     The Purchase Agreement.**

35.     On or about June 8, 2020 the parties entered into the Practice Purchase Agreement (the "Purchase Agreement.") (A true and correct copy of the Purchase Agreement is attached hereto as Exhibit A and incorporated herein.)

36.     Pursuant to the Purchase Agreement, Shawn agreed to sell the business assets and goodwill of the Business to Justin for $16 million.  (Ex. A, at ¶ 2(a)-(c).) Shawn, in compliance with the Purchases Agreement, completed the paperwork to successfully transition to Justin the compensation for the client accounts maintained by Ameriprise.

37.     Because of the pending FINRA investigation, Justin had his attorneys include an "Attrition Clause" in the Purchase Agreement.  Pursuant to the Attrition Clause, the total purchase price of the Business could be adjusted after two years based upon the retention or departure of a

select group of clients. (Ex. A, ¶ 2(d).) Justin demanded a two-year attrition period instead of a more standard one-year clause because of fears of client attrition due to the FINRA investigation.

38.    The parties contemporaneously executed several collateral agreements including a Promissory Note, a Consulting Agreement and a Non-Competition Agreement, and also exchanged several disclosures in connection with the sale.

39.    The FINRA complaint and Shawn's termination letter to Ameriprise were exchanged as part of the sale as scheduled disclosures even though Justin's counsel failed to provide a finalized closing book incorporating the exchanged materials. Justin thus received the FINRA Complaint as a formal disclosure during the sale.

**II.      The Note.**

40.    Justin's payment for the Business was financed through a $16 million Promissory Note ("Note") that Justin executed in his mother's favor. (A true and correct copy of the Note is attached hereto as Exhibit B and incorporated herein.)

41.    The Note called for $0 down and that Justin will repay the $16 million purchase price in equal monthly installments commencing on January 1, 2020 and every month thereafter for 10 years. (Ex. B, ¶ 2(a).)

42.    The Note provides that the Justin will be in default if a monthly payment is missed and the missed payment is not cured within 10 business days of receiving written notice from Shawn. (*Id.*, ¶ 5).

43.    Upon a default, the Note accelerates causing all "outstanding principal balance and all accrued interest" to accelerate and become due. (*Id.*, ¶ 3). Thereafter, the entire amount due accrues interest at a default rate of 8.00% per annum. (*Id.*).

44.    Specifically, the Acceleration Clause of the Note provides:

**Acceleration.** Upon any Default (defined herein) by [Justin], the outstanding principal balance and all accrued interest shall accelerate and become due, and the amount of such principal, until paid in full, shall bear interest for the entire period during which the Default is not cured at the rate of <u>Eight and 00/100 percent</u> (8.00%) per annum (**"Default Rate"**), calculated based on a standard interest calculation assuming each month has thirty (30) days and each year has three hundred sixty (360) days.

(*Id.*)

### III.    Consulting Agreement.

45.    As part of the transaction, the parties also entered into a Consulting Agreement. Under the Consulting Agreement, Shawn agreed to provide consulting services free of charge to help Justin develop relationships with her former clients.

46.    The Consulting Agreement was intended to address the parties' concerns about Justin's ability to maintain Shawn's client relationships.  It served as Shawn's sole means to preserve the value of the Business to ensure that the Business generated sufficient income for Justin to pay the purchase price, and to help make sure that her former clients – many of whom are family and friends – would continue to receive excellent service from her son.

### IV.    The Non-Competition Agreement.

47.    Contemporaneously with the execution of the Purchase Agreement, Shawn entered into a Non-Competition Agreement with Justin. (A true and correct copy of the Non-Competition Agreement is attached hereto as Exhibit C and incorporated herein.)

48.    Pursuant to Paragraph 1 of the Non-Competition Agreement, Shawn, as "Seller", agreed among other things to the following:

1.    **<u>Non-Competition and Non-Solicitation.</u>**

(a)    Seller covenants and agrees that for a period of five (5) years in the State of Illinois for (i) and (ii) below or anywhere in the United States for (iii) below following the later of the Transaction Date as defined in the Purchase Agreement or the termination of the Consulting Agreement entered in by the Seller and Buyer ("Restricted Period"), Seller

8

shall not in any manner, directly or indirectly on behalf of the Buyer, except as may otherwise be agreed to between the parties in the overall sale transaction.

i.       Provide or conduct, recruit, offer to provide or conduct, solicit to render, or render financial services, investment or money management services, financial planning, brokerage transactions, securities transactions, private securities transactions, financial transactions or consulting services, insurance sales or service, estate planning, benefit planning, insurance due diligence or review, for any competing business of the sales or service, estate planning, benefit planning, insurance due diligence or review.

ii.       Assist in any way any person or entity to provide or conduct, recruit, offer to provide or conduct, solicit to render, or render: financial services, investment or money management services, financial planning, brokerage transactions, securities transactions, private securities transactions, financial transactions or consulting services, insurance sales or service, estate planning, benefit planning, insurance due diligence or review.

iii.       Own, manage, be employed by, be associated or affiliated with any person or entity which provides or conducts, recruits, offers to provide or conduct, solicits to render, or renders: financial services, investment or money management services, financial planning, brokerage transactions, securities transactions, private securities transactions, financial transactions or consulting services, insurance sales or service, estate planning, benefit planning, insurance due diligence or review for any of the clients or Client Accounts on **Exhibit "A"** to the Purchase Agreement.

**F.       Justin Defaults on First Payment and To Date Has Not Paid Any of the Purchase Price of the Business.**

49.       Throughout 2020, Shawn complied with all her obligations under the Purchase Agreement and related contractual agreements. This includes completing the paperwork to successfully transition the Business to Justin and to have the commissions and income from Ameriprise paid to Justin instead of Shawn.

50.       At all relevant times, the assets under management for the Purchase Agreement, and the income flow to Justin, were higher than the day Shawn and Justin closed on the purchase.

51.       Even though the personal relationship between Shawn and Justin had deteriorated after they closed on the sale of the Business, they continued to work regularly to transition the clients and Justin repeatedly indicated he would pay Shawn when the monies were due.

52. At no time prior to January 1, 2020, did the FINRA investigation or any action by Shawn damage the Business.

53. Notwithstanding her assistance and the overall health of the market which caused the value of the Business to immediately grow, Justin failed to make the initial interest-only payment that came due on January 1, 2020. Justin has never provided an explanation for why he has refused to pay, notwithstanding his promise to do so shortly before the due date for the first payment.

54. On January 8, 2021, Shawn issued Justin a Notice of Default that triggered both the 10-day cure period and the acceleration of the entire principal balance of the Note. (A true and correct copy of the January 8, 2021 Notice is attached hereto as Exhibit D and incorporated herein.)

55. Notwithstanding his receipt of the Notice, Justin failed to cure his default by failing to make the January 1, 2020 payment. To date, Justin has failed to make any payment on the Note.

56. Justin's refusal to pay has resulted in his obtaining his mother's business, worth at least $16 million, without any payment whatsoever. Since he took over the Business, Justin has on information and belief earned approximately $410,000 in monthly net profits.

**G.      Justin Prevents Shawn's Performance Under the Consulting Agreement**

57. After he failed to make the payment under the Note, during the spring of 2021, Justin began interfering with Shawn's ability to perform under the Consulting Agreement. Despite the non-payment, Shawn desired to maintain the value of the Business. Shawn was motivated to do so both because she wanted both her long-time former clients and Justin to succeed and because she did not want to trigger any reduction in price through the Attrition Clause.

58. Justin however interfered with Shawn's participation in client calls undertaken pursuant to the Consulting Agreement.

59.     He served her with cease and desist letters demanding that she cease all contact with former clients that to this day remain close personal friends and/or family.

60.     Justin had no contractual or legal right to prevent Shawn from talking with her friends or family.  Even though the Consulting Agreement required Justin to provide notice and an opportunity to cure he suddenly fired her and further attempted to ban her, unlawfully, from talking to friends and family.

## COUNT I
## BREACH OF CONTRACT – NOTE

61.     Shawn re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 60 as and for paragraph 61 of this Complaint.

62.     On or about June 8, 2020, the parties entered into a series of valid and binding contractual agreements including: a Purchase Agreement, a Note, a Non-Competition Agreement and a Consulting Agreement.

63.     Justin breached the Note by failing to make the scheduled interest-only payment on or before January 1, 2021.  (Ex. B, ¶¶ 2, 5.)

64.     At all times relevant prior to Justin's January 1, 2021 breach of the Note, Shawn performed or was willing to perform all her material obligations under the all the parties' respective June 8, 2020 agreements.

65.     On January 8, 2021, Shawn issued Justin a Notice of Default due to his failure to make the January 1, 2021 payment, which triggered both the 10-day cure period and the acceleration of the entire principal balance of the Note. (Ex. D; Ex. B, ¶¶ 2, 5.)

66.     Justin's default was not cured after written notice was provided, triggering an acceleration clause that caused the entire $16 million plus interest to become immediately due. (Ex. B, ¶ 3.)

67. Because the acceleration clause immediately matured the entire $16 million debt, the full amount is now due and owing. The Attrition Clause, which would only have come into effect two years after the sale of the Business, is now moot and unenforceable as a matter of law.

68. As a result of Justin's failure to comply with the terms of the Note, Shawn has been and continues to be damaged in an amount in excess of $16 million to be determined at trial.

69. The Note contains an attorneys' fees provision providing that "[a]ll costs incurred by [Shawn] in the collection of this Note, including, without limitation, reasonable attorneys' fees, shall be paid by [Justin]." (Ex. B, ¶ 8.)

70. The Note also contains a Default Rate of interest providing that after acceleration, interest shall be paid at a rate of 8% per annum until the acceleration amount is paid in full. (Ex. B, ¶ 3.)

WHEREFORE, Plaintiff, Shawn Parker, prays that this Court enter a judgment as follows:

A. Awarding Plaintiff compensatory damages in excess of $16 million in an amount to be determined at trial;

B. Awarding Plaintiff pre-judgment interest, interest at the Default Rate under the Note, costs and attorneys' fees; and

C. Granting Plaintiffs any additional relief this Court deems just and appropriate, including by way of alternate and supplemental relief a disgorgement of all earned profits to date.

## COUNT II
## DECLARATORY JUDGMENT – ATTRITION CLAUSE

71. Shawn re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 70 as and for paragraph 71 of this Complaint.

12

72. The June 8, 2020 Purchase Agreement includes an Attrition Clause that was intended to adjust the sales price two years after purchase to account for client retention. (Ex. A, § 2(d)).

73. The Attrition Clause was to be calculated based upon client retention percentages for a select group of the Business' clients. It was contemplated by both parties at the time of contracting that Shawn would provide consulting services to Justin following the sale to help ensure retention of the identified clients following the sale.

74. Since execution of the Purchase Agreement and Consulting Agreement, Justin has defaulted upon the terms of the Purchase Agreement and the Note, which accelerated the entire amount due. Furthermore, Justin prevented Shawn's performance under the Consulting Agreement, which was put in place so that Shawn could assist in maintaining client relationships and thereby preserve income to pay the Note.

75. Justin's default and the resulting acceleration of the full amount due under the Note occurred prior to the June 2022 two year date by which the Attrition Clause may have adjusted the purchase price.

76. Justin's default and failure to cure caused the entire balance of the Note to come due without application of the Acceleration Clause which would not have become effective until a year-and-a-half later.

77. Because the Acceleration Clause immediately matured the entire $16 million debt then owing, the Attrition Clause, which would only have come into effect two years after the sale of the Business, is now moot and unenforceable as a matter of law.

78.     Justin disagrees that the Attrition Claus is now moot and unenforceable as a matter of law. Therefore, an actual controversy exists regarding whether the Attrition Clause will apply in June 2022.

WHEREFORE, Plaintiff, Shawn Parker, prays that this Court enter a judgment as follows:

A.      Declaring that Justin materially breached the Note by failing to make the payments required by the Note;

B.      Declaring that because the payments under the Note are accelerated, the entire debt has matured and is due and owing;

C.      Declaring that as a result of the acceleration, the Attrition Clause is moot and unenforceable, and that Justin is barred from making any claim under the Attrition Clause;

D.      Barring Defendant from attributing any lost clients to Shawn's performance under the Consulting Agreement;

E.      Awarding Plaintiff pre-judgment interest, interest at the Default Rate under the Note, costs and attorneys' fees; and

F.      Granting Plaintiffs any additional relief this Court deems just and appropriate.

## COUNT III
## DECLARATORY JUDGMENT – DECLARATION THAT SHAWN IS  NOT RESTRICTED FROM COMPETING WITH JUSTIN
### (In the Alternative to Count I)

79.     Shawn re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 60 as and for paragraph 61 of this Complaint.

80.     This count is pled in the alternative to Count I and applies only if Shawn is unable to recover any monetary damages pursuant to Count I. Because of Justin's failure to pay any of

the purchase price of the Business, Shawn seeks a declaration that she is no longer bound by any of the obligations of the Non-Competition Agreement, and as a result is free to compete with Justin and solicit any of the client accounts, and is permitted to individually move any of the client accounts to a new broker.

81. On or about June 8, 2020, the parties entered into a series of valid and binding contractual agreements including: the Purchase Agreement, the Note, a Non-Competition Agreement and a Consulting Agreement.

82. At all times relevant, Shawn performed or was willing to perform all her material obligations under the all the parties' respective June 8, 2020 agreements.

83. Shawn has received no payments toward the $16 million purchase price of the Business as set forth in by the Note and Paragraph 2, "Purchase Price", of the Purchase Agreement. (Ex. A, ¶ 2.)

84. Justin has never paid a single cent for the Practice. While possessing the Practice Justin has, on information and belief, continued to earn approximately $410,000 in monthly net profits. On information and belief, Justin has earned in excess of $9 million from the Business since the date of the Purchase Agreement.

85. Shawn has been damaged by not receiving any money for the Business, which is worth at least $16 million.

86. Justin failure to make payments is a material breach of the Purchase Agreement.

87. Pled solely in the alternative to Count I, because of Justin's failure to pay any of the purchase price of the Business, Shawn is entitled to a declaration: (i) that she is not bound by the Non-Competition Agreement: (ii) that she is free to compete with Justin and solicit any of the

client accounts; and (iii) that she is permitted to individually move any of the client accounts to a new broker.

WHEREFORE, Plaintiff, Shawn Parker, prays that this Court enter a judgment as follows:

A. Declaring that Justin materially breached the Non-Competition Agreement by failing to make the payments required by the Note;

B. Declaring that Shawn is not bound by the Non-Competition Agreement:

C. Declaring that Shawn is free to compete with Justin and solicit any of the client accounts;

D. Declaring that Justin may individually move any client to a new broker;

E. Awarding Plaintiff pre-judgment interests, costs and attorneys' fees; and

F. Granting Plaintiffs any additional relief this Court deems just and appropriate.

## COUNT IV
## UNJUST ENRICHMENT
### (In the Alternative to Count I)

88. Shawn re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 60 as and for paragraph 88 of this Complaint

89. On or about June 8, 2020, Shawn sold her highly lucrative financial advisory Business to Justin for an agreed sum of $16 million.

90. Shawn conveyed the Business to her son at that time, along with all the revenues it continues to generate on a monthly basis.

91. To date, Justin has refused to pay any money for the Business despite the value of the Business skyrocketing in the year-and-a-half since the sale.

92.     Since he took over the Business, Justin has, on information and belief, earned approximately $410,000 in monthly net profits. On information and belief, Justin has earned in excess of $9 million from the Business since the date of the Purchase Agreement.

93.     Justin has received this income as a result of Shawn signing over to him the right to the commissions generated from the client accounts that are maintained by Ameriprise.

94.     Justin has retained the benefits of that transaction by taking possession of the Business, managing it, and collecting revenues from it despite never paying a single penny of the approximately $16 million purchase price of the assets and "good will" of Shawn's Business.

95.     Justin's retention of the Business and the millions of dollars it generates for him in earnings violates fundamental principles of justice, equality and good conscience.

96.     As a result of that wrongful conduct, Justin has been unjustly enriched with possession of the Business and the income earned therefrom that would otherwise have gone to Shawn or been factored into a third-party purchaser's offer to purchase.

WHEREFORE, Plaintiff, Shawn Parker, prays that this Court enter a judgment as follows:

A.     Ordering that Justin disgorge all revenues earned from the Business;

B.     Awarding Plaintiff compensatory damages in amount to be determined at trial;

B.     Awarding Plaintiff pre-judgment interests, costs and attorneys' fees; and

C.     Granting Plaintiffs any additional relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiffs demand a trial by jury on all issues.

Date: February 3, 2022

SHAWN PARKER, by her Attorneys,
Roetzel & Andress, LPA


/s/ Marc H. Kallish

Marc H. Kallish (6231021)
Garry L. Wills (6280052)
30 N. LaSalle Street, Suite 2800
Chicago, IL  60602
312.580.1200

18

17637680 _9