# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

SHAWN PARKER,
          Plaintiff

      v.

JUSTIN PARKER,
          Defendant

No. 22 CV 615

Judge Jeremy C. Daniel

## MEMORANDUM OPINION AND ORDER

This case is before the Court on the parties' cross motions for partial summary judgment. The dispute centers on the contested sale of the plaintiff's former financial services advisory business. The plaintiff ran that business from 1999 until 2020, when she agreed to sell it to the defendant, her son, for $16 million. But the defendant never paid the plaintiff, so she brought this lawsuit. The defendant raised a slew of affirmative defenses and brought counterclaims of his own. For the reasons stated in this order, the plaintiff's motion for partial summary judgment is granted in part and denied in part, and the defendant's motion for partial summary judgment is denied.

## BACKGROUND

The following facts are taken from the parties' Local Rule 56.1 submissions,[1] the materials cited therein, and other aspects of the record in this case.

---

[1] Defendant's Responses to Plaintiff's Rule 56.1 Statement of Undisputed Material Facts ("Def. Resp. to Pl. SOF") (R. 258); Plaintiff's Responses to Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Pl. Resp. to Def. SOF") (R. 269); Plaintiff's Responses to Defendant's Statement of Additional Material Facts ("Pl. Resp. to Def. Add'l SOF") (R. 271); Defendant's Responses to Plaintiff's Rule 56.1 Statement of Additional Material Facts ("Def. Resp. to Pl. Add'l SOF") (R. 283).

## I.     THE CONTESTED TRANSACTION

### A.     The Plaintiff's Financial Services Business

In 1999, the plaintiff started a financial services advisory business. (Def. Resp. to Pl. Add'l SOF ¶ 1.)[2] She entered into a Franchise Agreement with American Express Financial Advisors Inc. (which later became Ameriprise Financial Services, Inc. ("Ameriprise")), and upon execution of that agreement she became an Ameriprise franchisee. (*Id.*) The defendant, the plaintiff's son, began working for the plaintiff as an administrative assistant in 2004. (*Id.* ¶ 2.) In 2008, he became an Associate Financial Advisor in her business. (*Id.* ¶ 3.)

In February 2020, Ameriprise notified the plaintiff that it intended to terminate its franchise relationship with her on June 12, 2020. (Pl. Resp. to Def. SOF ¶ 7.) Ameriprise did so after it determined that the plaintiff violated its Compliance Manual and Global Code of Conduct. (*Id.*) On May 17, 2020, the plaintiff notified Ameriprise that she was resigning/terminating her Franchise Agreement, which would become effective on June 8, 2020, and that she intended to sell her business to her son. (Def. Resp. to Pl. SOF ¶ 9.) June 8, 2020, was the day the parties agreed to close their contemplated transaction, meaning the plaintiff's business would on that day be transferred to the defendant. (*Id.* ¶ 10.)

---

[2] For ECF filings, the Court cites to the page number(s) in the document's ECF header unless citing to a particular paragraph or other page designation is more appropriate. For documents filed under seal, the Court cites the sealed version of the documents while attempting not to reveal any information that could be reasonably deemed confidential. Confidential information is discussed to the extent necessary to explain the path of the Court's reasoning. *See In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000).

### B.    The Plaintiff's Transfer Right

Under her Franchise Agreement, the plaintiff retained an ability to sell her interest in her practice, though the parties dispute the scope of that right and what she could actually transfer. (Pl. Resp. to Def. SOF. ¶¶ 2–8; Def. Resp. to Pl. SOF ¶¶ 5–8.) For instance, while the plaintiff's "original books and records containing Client lists" and other items belonged to Ameriprise upon termination of the Franchise Agreement, those books and records would not automatically revert to Ameriprise if the plaintiff transferred the business as provided elsewhere in the agreement. (R. 249-1 § 11.) Testimony in the record supports each side's position—the plaintiff retained some right, but not an absolute right, to transfer certain assets to a qualified recipient. (*See, e.g.*, R. 240-3 at 60:16–61:22, 331:7–333:4; R. 240-1 at 56:18–60:22). The parties dispute what elements of the plaintiff's business belonged to her (as opposed to Ameriprise), and what elements of the business could therefore be transferred. Pl. Resp. to Def. SOF. ¶¶ 2–8; Def. Resp. to Pl. SOF ¶¶ 5–8.)

The plaintiff opted to transfer her business to the defendant, who was in good standing with Ameriprise. (Pl. Resp. to Def. SOF ¶¶ 9, 11.) The plaintiff notified Ameriprise of her decision on May 17, 2020, and she directed Ameriprise that all "practice and client paper files" should go to the defendant. (Def. Resp. to Pl. SOF ¶ 9.) Prior to the transaction, the defendant executed a Franchise Agreement of his own with Ameriprise. (*Id.* ¶ 47.)

### C.    The PPA and the Closing

On May 26, 2020, the parties executed four interrelated contracts with an effective date of June 8, 2020: a Practice Purchase Agreement ("PPA" (R. 238-6)), a

promissory note (the "Note"), a Consulting Agreement, and a Non-Competition Agreement. (Pl. Resp. to Def. SOF ¶ 13.) The purchase price of the transaction was $16 million. (Def. Resp to Pl. Add'l SOF ¶ 11.) The PPA states that the plaintiff was selling "the Goodwill and Assets of [the plaintiff] related to the Business" and provides a non-exhaustive list of what that includes. (PPA § 1(a).)

The PPA contemplated a closing date of "June 8th, 2020 . . . , or such other date as Buyer and Seller may mutually agree upon." (*Id.* § 3(a).) However, no in-person closing ever occurred. (Pl. Resp. to Def. SOF ¶ 35.) Additionally, the PPA states that closing was "subject to satisfaction of the conditions precedent" listed elsewhere. (Pl. Resp. to Def. SOF ¶ 19.) The condition precedent relevant to this dispute reads,

> Seller amending and updating **Exhibit A** as necessary as of the Closing Date to reflect to Buyer's satisfaction the complete list of Clients transferred to Buyer as of Closing, along with the *Assets Under Management* for each respective Client ("Client AUM"). At closing, Seller shall provide on **Exhibit A** the Client AUM as reported in Ameriprise's most recent twenty six (26) service period recurring revenue report to the Closing Date.

(PPA § 1(d)(ii), the "Exhibit A condition.") In the PPA's recitals, it notes that "[t]he Seller's client list is attached as **Exhibit A** hereto and made a part hereof." (*Id.* § D.)

On May 17, 2020, the plaintiff sent the defendant a spreadsheet titled "GDC [Gross Dealer Concession] By Client Group Product Details" (the "GDC Report"). (Def. Resp. to Pl. SOF ¶ 25; Pl. Resp. to Def. SOF ¶ 30.) This report was generated by Ameriprise, with a "Report Date" of April 30, 2020, and a "Run Date" of May 17, 2020. (Def. Resp. to Pl. SOF ¶ 25.) The GDC Report displayed the most recent data as of May 26, 2020, with the plaintiff's list of clients and the associated assets under

4

management. (*Id.* ¶ 26; Def. Resp. to Pl. Add'l SOF ¶ 36.) The most up-to-date report of the plaintiff's client assets under management prior to the scheduled June 8 closing would have captured data through May 31, 2020. (Pl. Resp. to Def. SOF ¶ 32; *see also* R. 240-1 at 62:25–68:8. 81:5–85:8; *but see* R. 249-9 at 110:17–111:8.) The defendant testified that "[t]here was never an Exhibit A that was ever attached and there was never an agreed document that was Exhibit A." (R. 240-2 at 197:4–11.)

On June 8, 2020, Ameriprise emailed the defendant, attaching an Internal Client Transfer Form executed by the plaintiff and defendant. (Def. Resp. to Pl. SOF ¶ 12.) This Form listed the plaintiff as the "Transferring Advisor" and the defendant as the "Acquiring Advisor." (Def. Resp. to Pl. Add'l SOF ¶ 4.) The parties dispute what information was transferred on this form and whether it contained all the information required under the PPA. (*See, e.g.,* Def. Resp. to Pl. SOF ¶¶ 24–28; Pl. Resp. to Def. Add'l SOF ¶ 13.) The parties also dispute whether, once the transfer was completed, the defendant had access to all GDC reports. (Def. Resp. to Pl. SOF ¶ 28; Pl. Resp. to Def. Add'l SOF ¶ 13; R. 249-9 at 106:6–21.)

Following the transfer and the plaintiff's disassociation from Ameriprise, she lost access to her Ameriprise email and its servers. (Def. Resp. to Pl. SOF ¶ 29.) The plaintiff testified that she did not attempt to download a report that would have captured client data through May 31, 2020 before June 8. (Pl. Resp. to Def. SOF ¶¶ 33–34.) She also testified that the defendant never requested an updated report with data through May 31, 2020. (R. 249-4 at 202:17–203:20.) After the plaintiff lost access to the Ameriprise servers, however, she asked the defendant more than once for a

copy of a May 31, 2020, GDC by Client Group Product Detail by Primary Advisor Report. (Def. Resp. to Pl. SOF ¶ 30.) The defendant did not provide one. (*Id.*)

### D. The Promissory Note

The transaction was secured by a Promissory Note. (Def. Resp. to Pl. SOF ¶ 10.) The plaintiff signed the Note, which listed the defendant as the payee. (*Id.* ¶ 11.) The Note was made out for $16 million, which was the amount the parties agreed to for the transaction. (*Id.* ¶ 10; Def. Resp to Pl. Add'l SOF ¶ 11.) It specified that a default occurs if the defendant "fails to pay any of the Indebtedness." (Def. Resp. to Pl. SOF ¶ 17.) Upon default, the Note's acceleration clause would kick in, and the full amount would become due. (*Id.*) The Note also contains a waiver provision stating that the defendant waives the right to assert an enumerated set of defenses, and that the defendant assumes an "absolute and unconditional" obligation to pay "any monies due and owing" under the Note. (R. 238-7 ¶ 6.)

In July 2020, the defendant emailed the plaintiff and told her that he intended to make "a payment of back interest and first payment 1-2-2021." (Def. Resp. to Pl. SOF ¶ 19.) However, the defendant never paid. (*Id.* ¶¶ 18.) To date, the defendant has not paid any amount to the plaintiff. (*Id.* ¶ 23.)

### E. The Consulting Agreement

The parties also executed a Consulting Agreement that detailed the plaintiff's post-closing duties to assist transitioning the business and client relationships to the defendant. (Def. Resp. to Pl. SOF ¶¶ 59–60.) This agreement was intended to facilitate the transfer of goodwill, which is something that the parties agreed would be transferred as part of the transaction. (Pl. Resp. to Def. SOF ¶ 16.) Because she

6

was no longer formally associated with Ameriprise, the plaintiff's contributions to the business were restricted to only certain types of activities. (*Id.* ¶ 69.) Part of her post-closing obligations were to participate in client and internal meetings, and otherwise assist with transitioning the goodwill she earned with her clients to the defendant. (*Id.* ¶¶ 70–71.) The parties dispute whether the plaintiff ever transferred her goodwill. Evidence in the record shows both that the plaintiff engaged in client meetings, but also that at times she held herself out as the lead financial advisor for clients. (*See* Pl. Resp. to Def. SOF ¶¶ 23–26, 28–31.)

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Where, as here, the parties file cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made." *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017) (citation omitted). The nonmovant must present "specific facts showing that there is a genuine issue for trial" to defeat summary judgment. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 896 (7th Cir. 2018) (citation omitted).

## ANALYSIS

### I. BREACH OF THE PROMISSORY NOTE (COUNT I) AND FAILURE TO SATISFY CONDITION PRECEDENT (AFF. DEF. I)

The parties cross-move for summary judgment on the plaintiff's Count I for breach of the Note and the defendant's affirmative defense for failure to satisfy a condition precedent. Under Illinois law,[3] a promissory note is treated as a contract. *See First Midwest Bank v. Cobo*, 90 N.E.3d 567, 572 (Ill. App. Ct. 2016), *aff'd*, 124 N.E.3d 926. A breach of contract claim requires "a valid and enforceable contract, performance by the plaintiff, a breach by the defendant, and a resulting injury to the plaintiff." *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC*, 119 F.4th 522, 525–26 (7th Cir. 2024) (citation omitted). To recover under a promissory note, a plaintiff must show that "(1) the defendant executed the . . . promissory note; (2) the plaintiff is the holder of the note; and (3) the defendant has no viable defense." *Riley v. Argonaut Midwest Holdings, L.L.C.*, No. 06 C 5026, 2007 WL 2461661, at *3 (N.D. Ill. Aug. 28, 2007) (citation omitted).

The plaintiff contends that she is entitled to summary judgment on her breach of contract claim because the defendant failed to pay as required without excuse. The defendant's first affirmative defense argues that the plaintiff failed to satisfy a condition precedent in the PPA, so he was not obligated to pay. (R. 178 ¶¶ 1–7.)[4] As

---

[3] The PPA is governed by Illinois law. (PPA § 12(d).)

[4] When parties execute multiple contracts as part of a single transaction, "they are, in the eyes of the law, one contract." *In re Duckworth*, 776 F.3d 453, 457 (7th Cir. 2014) (quoted source omitted). It is undisputed that the four contracts were executed contemporaneously as part of one transaction, (Def. Resp. to Pl. SOF ¶ 10), meaning the condition precedent in the PPA applies to any payment obligations under the Note.

to recovery under the Note, the parties do not dispute the first two elements. (*See* Def. Resp. to Pl. SOF ¶¶ 10–11, 18, 21, 23.) They disagree on whether the defendant has any viable defense to non-payment, which overlaps with his affirmative defenses.

### A.    Satisfaction of the Condition Precedent

"A condition precedent is one that must be met before a contract becomes effective or that is to be performed by one party to an existing contract before the other party is obligated to perform." *Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 861 (7th Cir. 2020) (quoting *Cath. Charities of Archdiocese of Chi. v. Thorpe*, 741 N.E.2d 651, 653 (Ill. App. Ct. 2000)). "Whether an act is necessary to formation of the contract or to the performance of an obligation under the contract depends upon the facts of the case." *McAnelly v. Graves*, 467 N.E.2d 377, 379 (Ill. App. Ct. 1984). However, the parties' intent "to create a condition precedent to the formation of a contract is a question of law where the language in the instrument is unambiguous." *Cath. Charities of Archdiocese of Chi.*, 741 N.E.2d at 653.

Here, the PPA's language is unambiguous and it does not express an intent to condition contract formation on satisfaction of the Exhibit A condition. The PPA states that the condition is "an independent condition precedent to Closing." (PPA § 1(d).) That is not the same as an independent condition to contracting. The PPA, executed prior to the contemplated closing date, evidences the parties' mutual assent to contract. Where parties mutually assent to form a binding contract, "agreed-on conditions only affect the duty to perform and the contract is valid." *Regency Com. Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 322 (Ill. App. Ct. 2007) (citing *McAnelly*, 467 N.E.2d at 379). Additionally, because the Exhibit A condition relates only to the

9

plaintiff's performance obligations, it is a condition precedent to performance, not contract formation. *See McAnelly*, 467 N.E.2d at 379 ("[W]here a condition goes solely to the obligation of the parties to perform, existence of such a condition does not prevent the formation of a valid contract.").[5] This means a failure to fulfill a condition precedent affects the other party's obligations, not whether a contract exists.

While a valid and enforceable contract exists in this case, there are genuine disputes of material fact as to whether the Exhibit A condition was satisfied. The parties offer differing accounts of what satisfying the Exhibit A condition must look like. The Exhibit A condition requires

> Seller amending and updating **Exhibit A** as necessary as of the Closing Date to reflect to Buyer's satisfaction the complete list of Clients transferred to Buyer as of Closing, along with the *Assets Under Management* for each respective Client ("Client AUM"). At closing, Seller shall provide on **Exhibit A** the Client AUM as reported in Ameriprise's most recent twenty six (26) service period recurring revenue report to the Closing Date.

(PPA § 1(d)(ii).) By the defendant's read, the plaintiff had to provide "[a]t the closing . . . Exhibit A—*i.e.*, a comprehensive 'client list'—with the most recent total assets under management for these clients as of the date of the Closing." (R. 248 at 13.) He argues the GDC Report lacks information through closing, and cites evidence showing that the plaintiff failed to run a report that would capture data as of closing. (*Id.* at 13–20.) The plaintiff argues that the GDC Report was the Exhibit A she was required

---

[5] Because an enforceable contract exists, the plaintiff cannot seek damages for unjust enrichment. *Prima Tek II, L.L.C. v. Klerk's Plastic Indus., B.V.*, 525 F.3d 533, 541 (7th Cir. 2008) (citation omitted) ("Illinois law is again clear: damages for unjust enrichment are not awardable when, as here, there is a contract between the parties on the subject in dispute.").

to provide, and that the condition only required her to "amend[] and updat[e] . . . as necessary as of the Closing Date to reflect to Buyer's satisfaction." (R. 239 at 27–28; R. 267 at 20–27.) Because the defendant did not indicate that he was dissatisfied with the GDC Report, the PPA did not require her to provide an amended or updated version. (*Id.*) Further, she contends that on June 8, Ameriprise transferred the plaintiff's clients to the defendant, and in doing so Ameriprise provided him with the full list of her client groups and assets under management, so the defendant had all the information he was owed under the PPA. (*Id.*)

A factual dispute remains as to whether the Exhibit A condition was satisfied, precluding summary judgment in favor of either party. On one hand, a reasonable jury could find that the plaintiff satisfied the condition by sending the GDC Report and authorizing Ameriprise to transfer the plaintiff's client list and assets under management. On the other hand, evidence would also support a reasonable jury's conclusion that the transfer did not convey the required information in the manner required, and that the plaintiff had the ability to provide the defendant with an updated GDC Report but opted not to. Because genuine disputes of material fact exist as to whether the condition was satisfied, the Court denies each party's motion for summary judgment on the plaintiff's Count I and the defendant's first defense.

### B. Waiver of the Condition Precedent

The plaintiff argues that the defendant waived the right to assert any defenses under the Note, both contractually and by his conduct. To waive a right, a party must intentionally relinquish a known right. *Sethness-Greenleaf Inc. v. Green River Corp.*, 65 F.3d 64, 67 (7th Cir. 1995).

11

### 1.     Contractual Waiver

The plaintiff first argues that the defendant contractually waived his right to assert any defense. (R. 239 at 11–12.) The Note's waiver provision reads:

> Payor hereby waives presentment for payment, demand, notice of nonpayment (except notice, if any, required under the terms of this Note), notice of protest and protest of this Note, diligence in collection or bringing suit, and all endorsers, sureties and guarantors hereof consent to any and all extensions of time, renewals, waivers or modifications that may be granted by Payee with respect to payment or other provisions of this Note, and to the release of any collateral or any part of this Note, with or without substitution. The liability of Payor shall be absolute and unconditional, and the payment of any monies due and owing under the terms of this Note shall be made notwithstanding the existence of any alleged set-offs, counter-claims, or disputes of any nature claimed or asserted by Payor against Payee.

(R. 238-7 ¶ 6.) The plaintiff argues the defendant agreed that "any disputes he had with [the plaintiff] would not excuse or delay his obligation to pay." (R. 266 at 10.) While Illinois law does allow parties to contractually waive all defenses, *see Bank of Am., N.A. v. 108 N. State Retail LLC*, 928 N.E. 42, 55 (Ill. App. Ct. 2010), the plaintiff has not met her burden of producing evidence that shows, clearly and convincingly, that the defendant did so here.

First, unlike the cases on which the plaintiff relies, this waiver clause appears to enumerate a finite list of waived defenses. It does not, for instance, include the broad and certain language found in the cases cited by the plaintiff, such as that a party waived "all rights" or "all defenses," or that the party had "no defenses."[6] Illinois

---

[6] *See, e.g., Bank of Am., N.A.*, 928 N.E.2d at 55 (waiver of "any defense"); *FirstMerit Bank, N.A. v. Stave Props., Inc.*, 29 F. Supp. 3d 1151, 1153 (N.D. Ill. 2014) (waiver of "any" claims);

courts will uphold such broad waivers of all defenses where the contract contains "clear and unambiguous" language, which is not the case here. *Bank of Am., N.A.*, 928 N.E.2d at 55. Second, the "absolute and unconditional" obligation applies to "monies due and owing" under the Note. Whether the defendant owes any amount to the plaintiff under the contract is a core factual issue that, for the reasons explained above, cannot be resolved at this stage. As a result, the plaintiff has not met her burden of showing, by clear and convincing evidence, that the defendant intentionally relinquished a known right. *Sethness-Greenleaf Inc.*, 65 F.3d at 67.

### 2.        Waiver by Conduct

The plaintiff next argues that the defendant waived fulfillment of the Exhibit A condition by acting in a way consistent with the PPA's validity and by accepting the plaintiff's performance. A party can waive a condition precedent by engaging in conduct consistent with a valid contract, including by accepting the other party's performance. *Jokich v. Rush Univ. Med. Ctr.*, 42 F.4th 626, 636 (7th Cir. 2022).

Here, however, factual disputes preclude a finding of waiver by conduct. First, there is a genuine dispute of material fact as to whether the defendant accepted the plaintiff's performance. There is evidence in the record that the defendant was operating his own business under his separate Franchise Agreement and receiving compensation for advising client accounts under that agreement, and that the plaintiff failed to deliver the required client information and goodwill the defendant bargained for. Further, a reasonable jury could conclude that the defendant sending

---

*Chrysler Credit Corp. v. Marino*, 63 F.3d 574, 577 (7th Cir. 1995) (waiver of "each and every defense" available under applicable law).

13

the plaintiff a notice of breach cuts against an intentional waiver of a contractual right. (Def. Resp. to Pl. SOF ¶ 22.) This, among other evidence, casts into doubt whether the defendant's conduct was "inconsistent with any intention other than to waive" his right. *Am. Prot. Ins. Co. v. Airborne, Inc.*, 476 F. Supp. 2d 985, 994 (N.D. Ill. 2007). While the plaintiff points to evidence supporting a finder or waiver, the record does not establish conduct "wholly inconsistent" with waiver. *Jokich*, 42 F.4th at 636.

Further, a party may waive performance of a condition precedent "where the condition precedent is intended for the benefit of the waiving party." *Cath. Charities of Archdiocese of Chi.*, 741 N.E.2d at 654 (citations omitted). Illinois courts have found waiver on this basis in the context of mortgage contingency clauses, which allow purchasers to back out of real estate transactions if they fail to secure financing. *See Lobo IV, LLC v. V Land Chi. Canal, LLC*, 138 N.E.3d 824, 848 (Ill. App. Ct. 2019). The defendant contends that the Exhibit A condition is not exclusively for his benefit. While the Court does not find the defendant's argument persuasive, waiver of a provision for a party's benefit still requires the party to act in a way that shows an intentional relinquishment of a known right. *See Cath. Charities of Archdiocese of Chi.*, 741 N.E.2d at 654 (finding waiver of a provision for a seller's benefit based on conduct expressly evidencing waiver). As explained above, genuine disputes of fact remain as to whether the defendant's conduct amounted to an intentional relinquishment of a contractual right. Further, the fact that the defendant never made a payment under the Note may be evidence that the defendant did not accept

14

the plaintiff's purported performance. Additionally, the PPA states that "[n]either any failure nor any delay in exercising any right . . . shall operate as a waiver thereof." (PPA § 12(a).) This all cuts against the plaintiff's argument for waiver by conduct.

In the end, "[t]he potential for waiver of a condition precedent through actions or deeds involves a question of fact." *Downs v. Rosenthal Collins Grp., LLC*, 963 N.E.2d 282, 291 (Ill. App. Ct. 2011). Here, the facts are subject to genuine dispute, so summary judgment is not appropriate.

### 3.    Control of Performance

The plaintiff argues that the defendant could have, but opted not to, fulfill the condition precedent because he had access to the Ameriprise systems on the day of closing. Illinois law requires a party who has control over the occurrence of a condition precedent to use reasonable efforts to have it occur. *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 26 (2007). The plaintiff argues that because, as of the June 8 closing, she lacked access to the Ameriprise systems, but the defendant had access, he did not use reasonable efforts to make the condition occur, and instead now seeks to leverage its non-occurrence. While it is undisputed that the plaintiff lost access to the Ameriprise systems once her affiliation was terminated, it is disputed whether the defendant had access to all the data from the plaintiff's former business. (Def. Resp. to Pl. SOF ¶ 28; Pl. Resp. to Def. Add'l SOF ¶ 13; R. 249-9 at 106:6–21.) Accordingly, summary judgment on this basis is not warranted.

### II.    THE DEFENDANT'S AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

The plaintiff argues that she is entitled to summary judgment on all the defendant's affirmative defenses and counterclaims. The Court addressed above the

15

defendant's first affirmative defense for failure to satisfy a condition precedent, and it now turns to the remaining defenses and counterclaims.

### A. Fraudulent Inducement (Aff. Def. II, Counterclaim I)

Under Illinois law, fraudulent inducement requires: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Hoseman v. Weinschneider*, 322 F.3d 468, 476 (7th Cir. 2003) (quoted source omitted). The usual remedy for fraudulent inducement is rescission. *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 726 (7th Cir. 2008) (citations omitted).

### 1. Availability of Rescission

Rescission is an equitable remedy available at the discretion of the Court that undoes a contract and places the parties back in their position at the time the contract was made. *Ill. State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 821 N.E.2d 706, 713 (Ill. App. Ct. 2004). "[A] party seeking rescission must restore the other party to the status quo existing at the time the contract was made." *Puskar v. Hughes*, 533 N.E.2d 962, 966 (Ill. App. Ct. 1989).

The plaintiff argues that rescission is not an available remedy. The Court agrees. Restoring the parties to the status quo *ante* is not possible here, so rescission is unavailable. Had the plaintiff not transacted with the defendant on June 8, 2020, Ameriprise would have terminated her Franchise Agreement on June 12. (Def. Resp. to Pl. SOF ¶ 8.) The plaintiff would have had ninety days to find a different purchaser following the June 12 termination date. (*Id.*) After that, she would have lost her

16

status as a franchisee. Because the plaintiff is no longer an Ameriprise franchisee, it is not possible to restore her to her pre-contract position when she was a franchisee. *See Klucznik v. Nikitopoulos*, 503 N.E.2d 1147, 1150 (Ill. App. Ct. 1987) (citations omitted) ("[A] court will not grant rescission of a contract in any event where the status quo ante of the parties cannot be restored.").

The defendant argues that because it was the plaintiff who rendered restoring the status quo impossible due to fraud, rescission is available. But this exception applies only when both (1) the party seeking rescission is not the reason why restoration to the status quo is impossible and (2) the "party opposing the rescission has obtained a benefit from the contract." *23-25 Bldg. P'ship v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1163–64 (Ill. App. Ct. 2008) (citations omitted). Here, it is undisputed that the defendant has not paid the plaintiff any money, so she has not received her bargained-for benefit under the contract. Because the Court has concluded that the defendant cannot seek rescission, the Court does not address the plaintiff's argument that the defendant unreasonably delayed in seeking rescission.

### 2. The Alleged Fraudulent Statements

Although rescission is not an available remedy to the defendant, the Court next addresses whether the defendant's assertions of fraud support his affirmative defense or an actionable counterclaim for damages. Fraudulent inducement is a "classic example of an issue of fact." *See TCS John Huxley Am., Inc. v. Sci. Games Corp.*, No. 19-CV-01846, 2021 WL 4264403, at *7 (N.D. Ill. Sept. 20, 2021) (citation omitted).

However, fraud claims cannot stand on allegations that merely repackage a contract breach. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 395 (7th Cir.

17

2011) (citing *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 844 (Ill. 2005) ("[F]raud claims must contain something more than reformulated allegations of a contractual breach."). Several of the alleged misrepresentations the defendant relies on simply claim that the plaintiff failed to perform as promised: (i) that the plaintiff stated she would transfer certain client assets when she could not, (ii) that she would transfer her goodwill but did not, and (iii) that she would be reasonably available for transition appointments but was not. (*See, e.g.*, R. 178 ¶ 15(i)–(ii), (vii)–(viii); R. 228 ¶ 171(a).) These statements cannot, as a matter of law, support the defendant's fraudulent inducement defense or counterclaim. *Greenberger*, 631 F.3d at 395.

The remaining pieces of the defendant's fraudulent inducement counterclaim and affirmative defense, however, present triable issues of fact. The defendant identifies statements and supporting evidence that the plaintiff, for instance, misrepresented her disciplinary history to the defendant, misstated details regarding the valuation of her practice to him, and continued to service clients by acting as the "lead" advisor. (R. 260 at 25–29.) The plaintiff attacks the quality of the evidence supporting the defendant's theory, (R. 239 at 16–25), but a factual dispute exists that the Court cannot resolve by weighing evidence at this stage. The plaintiff's reliance arguments similarly raise questions of fact. For instance, whether the defendant was justified in relying on the plaintiff's representations due to knowledge he had or should have had depends on conflicting evidence in the record. The plaintiff must show that only one conclusion can be drawn from evidence in record, *Aebischer v. Stryker Corp.*, 535 F.3d 732, 734 (7th Cir. 2008), which she has not done here.

18

The plaintiff's argument regarding lack of damages is a closer issue. However, viewed most favorably to the defendant, genuine factual disputes remain. Some evidence shows that the defendant's employees failed to identify any clients lost because of the defendant's alleged missteps. (Def. Resp. to Pl. SOF ¶ 75.) However, other evidence supports a finding that the defendant lost at least some business due to the plaintiff's alleged fraudulent conduct. (*See, e.g.*, R. 240-2 at 251:15–271:18.) At this stage, the Court cannot weigh this evidence. *Johnson*, 892 F.3d at 893 (citation omitted). The fraudulent inducement counterclaim and affirmative defense is subject to factual disputes that cannot be resolved at summary judgment.

### B.    Impossibility (Aff. Def. III)

"The doctrine of legal impossibility, or impossible performance, excuses performance of a contract only when performance is rendered objectively impossible either because the subject matter is destroyed or by operation of law." *Innovative Modular Sols. v. Hazel Crest Sch. Dist. 152.5*, 965 N.E.2d 414, 421 (Ill. 2012), *as modified on denial of reh'g* (Mar. 26, 2012) (citations omitted). The doctrine is "narrowly applied" and is appropriate in only "extreme circumstances." *YPI 180 N. LaSalle Owner, LLC v. 180 N. LaSalle II, LLC*, 933 N.E.2d 860, 865 (Ill. App. Ct. 2010) (citation omitted). The defendant contends that his performance was rendered impossible and is therefore excused for two reasons.

First, he argues the plaintiff engaged in financial advising despite not being licensed to do so, and he is not "legally permitted" to compensate the plaintiff for her consulting work that violated the law. But the Court has ruled that the contracts do not obligate the plaintiff to violate any securities laws or financial rules. (*See* R. 63.)

19

If the contract obligates the defendant to pay the plaintiff, and the contract does not require the plaintiff to engage in unlawful conduct, then the defendant could not be compensating the plaintiff for work not legally permitted. Further, the Consulting Agreement states that the compensation for "all" services rendered is "Zero (0) Dollars." (R. 238-8 § 2(a).) This means the defendant, in performing by paying, would not be compensating the plaintiff for any unlawful conduct.

Second, the defendant argues it was impossible to calculate the attrition amount because it was predicated on data in Exhibit A, which he never received. But that does not render the calculation objectively impossible, even if it makes the calculation more challenging or perhaps less accurate than it would be with the data. *See, e.g., Unite Here Health v. ML Plaza Owner, LLC*, No. 19 C 5314, 2020 WL 12441956, at *2 (N.D. Ill. Dec. 9, 2020) ("The difference is between saying 'the thing cannot be done' – it is objectively impossible – and 'I cannot do it'– it is subjectively impossible."). The defendant is saying he cannot calculate the amount because of supposedly missing data—not that the data to be included in Exhibit A was destroyed. That falls short of objective impossibility. *Innovative Modular Sols.*, 965 N.E.2d at 421. Because this is not the exception circumstance where the impossibility defense applies, the Court grants the plaintiff's motion for summary judgment on this affirmative defense.

### C. Unilateral Mistake (Aff. Def. IV, Counterclaim III)

The defendant argues that because the plaintiff mistakenly thought she could transfer assets she did not own, and because she mistakenly thought she did not need

20

to provide Exhibit A prior to closing, the contract must be rescinded. (R. 178 at 32-33.) Rescission based on a unilateral mistake may be proper when

> the party seeking rescission shows by clear and convincing evidence that (1) the mistake is of a material nature; (2) the mistake is of such consequence that enforcement is unconscionable; (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in status quo.

*Siegel v. Levy Org. Dev. Co.*, 607 N.E.2d 194, 199 (Ill. 1992) (quoted source omitted). This affirmative defense fails, as does the counterclaim, for two reasons.

First, the Court explained above that rescission is not available as a remedy because the plaintiff cannot be returned to her pre-contract position. Because this is an element of a unilateral mistake claim, *see Siegel*, 607 N.E.2d at 199, it must fail. Second, a contract "is not voidable in favor of the party who did not make a mistake." 7 Corbin on Contracts § 28.42; *see also* Restatement (Second) of Contracts § 153 (a unilateral mistake made by a mistaken party renders the contract "voidable by him"); 27 Williston on Contracts § 70:104 (4th ed.) (same). Here, the defendant speculates that the plaintiff made a mistake as to what she owned (versus what Ameriprise owned) and what she had to do to satisfy the Exhibit A condition. He seeks rescission in his favor based on only the plaintiff's purported mistakes. However, he cannot obtain relief in his favor based on a mistake he did not make. *See* 7 Corbin on Contracts § 28.42. Accordingly, the Court grants the plaintiff's motion for summary judgment on this affirmative defense and counterclaim.

### D.  Prior Breach of Contract (Aff. Def. V, Counterclaim II)

The plaintiff contends that the defendant's prior breach defense fails as a matter of law. Illinois law recognizes a plaintiff's prior breach of contract as an affirmative defense. *See Carroll v. Acme-Cleveland Corp.*, 955 F.2d 1107, 1115 (7th Cir. 1992). If one party materially breaches a contract, the other party is excused from performing its obligations. *Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85, 95 (Ill. 2006). However, if the non-breaching party accepts benefits under the contract despite the breach, then the breach is partial, and the non-breaching party must perform. *PML Dev. LLC v. Vill. of Hawthorn Woods*, 226 N.E.3d 1163, 1175 (Ill. 2023).

Here, genuine disputes of material fact remain as to whether, and when, either party breached its contractual obligations. A reasonable jury could conclude that the plaintiff failed to provide Exhibit A in the manner prescribed, failed to transfer her goodwill, or failed to transfer all the assets she represented she could under the contract. A reasonable jury could also conclude that the plaintiff performed properly and the defendant's failure to pay constituted the first breach.

The plaintiff's reliance on the partial breach doctrine falls short because, as explained above, factual disputes exist regarding whether the defendant received or accepted benefits under the contract. Evidence in the record supports the defendant's position that he was benefitting from client accounts attached to his own business under his separate Franchise Agreement, not from anything he received from the plaintiff as part of the transaction. The plaintiff also argues that the defendant cannot prove damages stemming from any breach. However, there is evidence in the record that clients left the defendant's practice due to the plaintiff's departure and failure to

22

transfer her goodwill, and that the defendant suffered other categories of damages. (*See, e.g.*, Def. Resp. to Pl. SOF ¶¶ 76, 80.) Accordingly, the Court denies the plaintiff's motion for summary judgment on this affirmative defense and counterclaim.

### E. Breach of Duty of Good Faith and Fair Dealing (Aff. Def. VI)

Under Illinois law, every contract contains a duty of good faith and fair dealing. *Wolf v. Riverport Ins. Co.*, 132 F.4th 515, 520 (7th Cir. 2025) (citation omitted). However, it is not a standalone duty and it does not create any obligations; rather, it assists in resolving contractual ambiguity. *Id.* Where one party has discretion under a contract and improperly exercises its discretion, the duty is breached. *Id.*

The PPA obligates the plaintiff to, among other things, be "reasonably available to Buyer" and to "use commercially reasonable efforts to promptly" provide introductions to clients. (PPA § 8(a).) The Consulting Agreement requires the plaintiff to be "reasonably available from time to time to consult" with the defendant and to engage in four face-to-face appointments with clients, among other consulting obligations. (R. 238-8 § 1(a).) Factual disputes remain as to whether the plaintiff fulfilled these obligations, as the record contains evidence showing both that the plaintiff attended many client meetings, but also that she sought to limit her scheduled availability to assist the defendant and impeded transfer of her goodwill. (Pl. Resp. to Def. SOF ¶ 32; *see also* R. 240-1 at 62:25–68:8. 81:5–85:8; *but see* R. 249-9 at 110:17–111:8.) Further, there is evidence in the record of the plaintiff holding herself out as clients' point of contact, which a reasonable jury could rely on to conclude that she retained, and did not transfer, all her client goodwill. (*See* Pl. Resp.

23

to Def. SOF ¶¶ 23–26, 28–31.) Given the conflicting evidentiary record, the plaintiff is not entitled to summary judgment on this affirmative defense.

### F.     Contractual and Equitable Setoff (Aff. Defs. VII–VIII)

The plaintiff argues that the setoff defenses fail solely because these defenses were contractually waived. The Court concluded above that the plaintiff failed to meet her burden of establishing that the defendant contractually waived his defenses. Accordingly, the Court denies summary judgment on these affirmative defenses.

### CONCLUSION

The plaintiff's motion for partial summary judgment [236] is granted in part and denied in part. Specifically, the plaintiff's motion is granted as to the defendant's third and fourth affirmative defenses and the defendant's third counterclaim. It is denied in all other respects. The defendant's motion for partial summary judgment [244] is denied.

Date: May 5, 2026

JEREMY C. DANIEL
United States District Judge